399 F.3d 462
 EMPRESA CUBANA DEL TABACO, doing business as Cubatabaco, Plaintiff-Counter-Defendant-Appellee-Cross-Appellant,
v.
CULBRO CORPORATION, Defendant-Counter-Claimant,
General Cigar Co., Inc. and General Cigar Holdings, Inc. Defendants-Counterclaimants-Appellants-Cross-Appellees.
 Docket No. 04-2527-CV(L).
 Docket No. 04-3005-CV (XAP).
 United States Court of Appeals, Second Circuit.
 Argued: August 24, 2004.
 Decided: February 24, 2005.
 
 Maureen E. Mahoney, Latham & Watkins LLP, Washington, DC (John J. Kirby, Jr. and Alexandra A.E. Shapiro, Latham & Watkins LLP, New York, NY, on the brief; E. Marcellus Williamson, Latham & Watkins LLP, Washington DC, on the brief; Harry C. Marcus and Janet Dore, Morgan & Finnegan, L.L.P., New York, NY, of counsel), for Defendants-Counterclaimants-Appellants-Cross-Appellees.
 Michael Krinsky, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C. (David B. Goldstein, Christopher J. Klatell, and Carrie Corcoran, Boudin, Standard, Krinsky & Lieberman, P.C.; Kevin Walsh and Steven J. Young, Winston & Strawn, on the brief), New York, NY, for Plaintiff-Counter-Defendant-Appellee-Cross-Appellant.
 Peter D. Keisler, Assistant Attorney General; Douglas N. Letter and Jonathan H. Levy, Attorneys, Civil Division, U.S. Department of Justice, Washington DC; David N. Kelley, United States Attorney for the Southern District of New York, New York, NY; Arnold I. Havens, General Counsel, U.S. Department of the Treasury, Washington, DC, for Amicus Curiae United States of America.
 Before: CABRANES, STRAUB, WESLEY, Circuit Judges.
 STRAUB, Circuit Judge.
 
 
 1
 Defendants-Counterclaimants-Appellants-Cross-Appellees, General Cigar Co., Inc., and General Cigar Holdings, Inc. ("General Cigar"), appeal from a judgment and permanent injunction of the United States District Court for the Southern District of New York (Robert W. Sweet, Judge), entered on May 6, 2004, finding in favor of Plaintiff-Counter-Defendant-Appellee-Cross-Appellant, Empresa Cubana del Tabaco, doing business as Cubatabaco ("Cubatabaco"), on its claim of trademark infringement under Section 43(a) of the Lanham Act, ordering cancellation of General Cigar's United States trademark registration for COHIBA cigars, permanently enjoining General Cigar from further use of the COHIBA mark, and ordering General Cigar to deliver to Cubatabaco all merchandise, packaging and other materials bearing the COHIBA name, to recall from retail customers and distributors products bearing the mark, and to inform customers and distributors that they could not sell General Cigar's COHIBA-labeled products in the United States. Cubatabaco has cross-appealed from the District Court's dismissal of its treaty-based and state law claims.
 
 
 2
 This appeal arises from a dispute between Cubatabaco, a Cuban company, and General Cigar, an American company, over who has the right to use the COHIBA mark on cigars. After filing an application to register the COHIBA mark in Cuba in 1969, Cubatabaco began selling COHIBA cigars in Cuba. Cubatabaco has sold COHIBA cigars outside of Cuba since 1982, but, because of the United States embargo against Cuban goods, imposed in 1963, Cubatabaco has never sold COHIBA cigars in the United States. General Cigar obtained a registration for the COHIBA mark in the United States in 1981 and sold COHIBA cigars in the United States from 1978 until late 1987. In 1992, General Cigar relaunched a COHIBA cigar in the United States and has sold cigars under that mark in the United States since that time.
 
 
 3
 Cubatabaco claims that it owns the U.S. COHIBA trademark because General Cigar abandoned its 1981 registration in 1987 and that, by the time General Cigar resumed use of the mark in 1992, the Cuban COHIBA mark was sufficiently well known in the United States that it deserved protection under the so-called "famous marks doctrine." The District Court agreed and found that, although Cubatabaco had never used the mark in the United States and was prohibited from doing so under the embargo, it nonetheless owned the U.S. COHIBA mark. The District Court concluded that by failing to use the COHIBA mark from late 1987 to 1992, General Cigar abandoned its 1981 registration. It found further that because the Cuban COHIBA mark was sufficiently well known in the United States by November 1992, the date General Cigar resumed its use of the mark, Cubatabaco was entitled to priority in asserting ownership of the mark. After finding that there was a likelihood of confusion between the Cuban COHIBA mark and the General Cigar COHIBA mark, the court granted judgment to Cubatabaco on its claim for trademark infringement under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), cancelled General Cigar's registration of the mark, and enjoined General Cigar from using the mark. The court dismissed all other claims brought by Cubatabaco, including claims under international trademark treaties and New York law.
 
 
 4
 We do not reach the question of whether an entity that has not used a mark on products sold in the United States can nonetheless acquire a U.S. trademark through operation of the famous marks doctrine. We need not reach that question in this case because even were we to recognize and apply the famous marks doctrine, the Cuban embargo bars Cubatabaco's acquisition of the COHIBA mark via the famous marks doctrine. Therefore, we reverse the District Court's grant of judgment to Cubatabaco on its claim of trademark infringement under Section 43(a) of the Lanham Act. We affirm the District Court's dismissal of all other claims brought by Cubatabaco.
 
 BACKGROUND
 
 5
 In 1963 the United States imposed an embargo on Cuba. The Cuban Asset Control Regulations ("Embargo Regulations" or "Regulations"), 31 C.F.R. § 515.201 et seq., which were promulgated pursuant to Section 5(b) of the Trading with the Enemy Act of 1917, ch. 106, § 5(b), 40 Stat. 415 (codified as amended at 12 U.S.C. § 95a (2000)), contain the terms of the embargo. See Havana Club Holding, S.A. v. Galleon S.A., 203 F.3d 116, 120 (2d Cir.), cert. denied, 531 U.S. 918, 121 S.Ct. 277, 148 L.Ed.2d 201 (2000). In 1996 Congress codified the Regulations in the Cuban Liberty and Democratic Solidarity Act of 1996 ("LIBERTAD Act"), Pub.L. No. 104-114, Title I, § 102, Mar. 12, 1996, 110 Stat. 792 (1996) (codified at 22 U.S.C. § 6032(h)). "The Secretary of the Treasury has the authority to administer the Cuban embargo, which he has delegated to the Office of Foreign Assets Control (`OFAC')." Havana Club, 203 F.3d at 120 (citing 31 C.F.R. § 515.802). The Embargo Regulations prevent Cuban entities, such as Cubatabaco, from selling cigars in the United States. Despite its inability to sell cigars here, Cubatabaco claims that it owns the COHIBA mark in the United States and that General Cigar's sale of COHIBA cigars in the United States unlawfully infringes its mark.
 
 
 6
 The District Court, after a bench trial, issued a comprehensive opinion setting forth its factual findings. See Empresa Cubana del Tabaca v. Culbro Corp., No. 97 Civ. 8399, 2004 WL 602295, at *3-27 (S.D.N.Y. Mar.26, 2004) ("Empresa III"). Here we recount only those facts necessary to explain our holding.
 
 
 7
 In 1969 Cubatabaco filed an application to register the COHIBA mark in Cuba. Throughout the 1970s it sold COHIBA cigars in Cuba. By January 1978 Cubatabaco had applied to register the COHIBA mark in seventeen countries, including most Western European countries, but did not apply to register the mark in the United States. In 1982 Cubatabaco began selling COHIBA cigars outside of Cuba. In 1983 Cubatabaco considered registering its COHIBA mark in the United States but learned that General Cigar had already obtained the United States registration. On February 22, 1985, Cubatabaco filed an application with the United States Patent and Trademark Office ("PTO") to register its BEHIQUE mark in the United States with the same trade dress that it used on its COHIBA cigars elsewhere. In 1987 Cubatabaco considered challenging General Cigar's 1981 COHIBA registration, but chose not to take any action.
 
 
 8
 General Cigar first learned of the name "Cohiba" in the late 1970s after General Cigar executives read a Forbes magazine article stating that Cubatabaco was planning to sell its COHIBA cigars outside of Cuba. General Cigar filed an application to register the COHIBA mark with the PTO on March 13, 1978, with a claimed first use date of February 13, 1978. The application was unopposed, and General Cigar obtained the registration on February 17, 1981. General Cigar sold COHIBA cigars in the United States from 1978 until late 1987.
 
 
 9
 In February 1992 The Wine Spectator magazine published articles describing COHIBA as Cuba's "finest" cigar and "the hot brand." In September 1992, the premier issue of Cigar Aficionado magazine, which had a United States circulation of 115,000 copies, featured a story about Cubatabaco's Cuban COHIBA cigars. The magazine rated cigars and gave the Cubatabaco's COHIBA Robusto the highest ranking. Shortly thereafter, General Cigar decided to use COHIBA on a new premium cigar, which it launched on November 20, 1992. The District Court noted that General Cigar "acknowledges that the reintroduction was at least in part a response to Cigar Aficionado's coverage of the Cuban COHIBA." General Cigar filed for a second COHIBA registration on December 30, 1992, and the application was granted without opposition in 1995.
 
 
 10
 In late 1992 and early 1993 General Cigar considered seeking permission to use Cubatabaco's registered trade dress. In a January 1993 memo, General Cigar's then in-house counsel wrote that having permission to use the trade dress would help General Cigar "to exploit the popularity, familiarity, brand recognition and overall success of the Cuban Cohiba." General Cigar did not pursue further the plan to seek permission to use the trade dress.
 
 
 11
 In late January or February 1997 General Cigar decided to launch a new cigar under the COHIBA name. General Cigar acknowledges that the Cuban COHIBA was well known to U.S. cigar consumers by the time General Cigar launched its new product in the fall of 1997. The District Court noted that "[t]he 1997 advertising for the General Cigar COHIBA attempted to create an association in the consumer's mind to Cuba and the Cuban COHIBA."
 
 
 12
 In January 1997 Cubatabaco commenced a proceeding in the Trademark Trial and Appeal Board to cancel General Cigar's registration of the COHIBA mark. On November 12, 1997, Cubatabaco filed this action alleging thirteen claims against General Cigar. The first six claims alleged violations of various treaty provisions and asserted that Cubatabaco was entitled to relief under Sections 44(b) and 44(h) of the Lanham Act, 15 U.S.C. § 1126(b), (h). In particular, Cubatabaco claimed that General Cigar violated: (1) the protection under Article 6bis of the Paris Convention for the Protection of Industrial Property, Mar. 20, 1883, as revised at Stockholm, July 14, 1967, 21 U.S.T. 1583, 828 U.N.T.S. 305 ("Paris Convention"), for famous marks; (2) Section 10bis of the Paris Convention's prohibition against unfair competition; (3) Articles 7 and 8 of the General Inter-American Convention for Trade Mark and Commercial Protection, Feb. 20, 1929, 46 Stat. 2907 ("IAC"), by using and registering COHIBA for cigars with knowledge of Cubatabaco's use of the mark on cigars; (4) Articles 20 and 21 of the IAC's prohibition against unfair competition; (5) Article 22 of the Agreement on Trade-Related Aspects of Intellectual Property Rights ("TRIPS") by representing its cigar as the product of "Cuban seed"; and (6) Article 10 of the Paris Convention by representing its cigar as the product of "Cuban seed." In addition to the treaty-based claims, Cubatabaco alleged that: (7) General Cigar committed willful trademark and trade dress infringement in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (8) General Cigar engaged in false representation of source of origin in willful violation of Section 43(a) of the Lanham Act by stating that their cigars contained tobacco grown from Cuban seed; (9) General Cigar engaged in deceptive advertising in willful violation of Section 43(a) of the Lanham Act by stating that their cigars contained Cuban seed; (10) General Cigar's acts constituted unfair competition under New York law and under the laws of every state in which General Cigar has engaged in the misconduct alleged; (11) General Cigar's registration should be cancelled pursuant to 15 U.S.C. § 1120; (12) General Cigar's actions were likely to dilute Cubatabaco's COHIBA mark and constituted willful violation of New York General Business Law § 360l, comparable laws of other states where General Cigar engaged in the misconduct, and Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); and (13) General Cigar willfully misappropriated Cubatabaco's trademark in violation of New York law and the law of other states where General Cigar engaged in the conduct. Cubatabaco sought injunctive relief, damages, and attorneys' fees. General Cigar counterclaimed, seeking a declaratory judgment that it had the right to continued use and registration in the United States of the COHIBA mark, as well attorneys' fees and costs.
 
 
 13
 On December 4, 2000, Cubatabaco stipulated to the dismissal with prejudice of its Fifth, Sixth, Eighth, and Ninth claims for relief — i.e., the TRIPS claim, the claim that General Cigar violated Article 10 of the Paris Convention, and claims under Section 43(a) of the Lanham Act for false representation of source of origin and deceptive advertising.[1]
 
 
 14
 On November 29, 2001, General Cigar moved for summary judgment dismissing Cubatabaco's complaint on the basis of estoppel, acquiescence, and laches, due to Cubatabaco's alleged delay in challenging General Cigar's use of the COHIBA mark. On January 29, 2002, Cubatabaco moved to dismiss General Cigar's affirmative defenses. Cubatabaco also moved for partial summary judgment on its claim that General Cigar abandoned its 1981 registration, as well as its claims that General Cigar violated Articles 7 and 8 of the IAC, Article 6bis of the Paris Convention, New York common law, and the Federal Trademark Dilution Act.
 
 
 15
 On June 26, 2002, the District Court, resolving the motions, held that Cubatabaco was entitled to partial summary judgment on its claim that General Cigar had abandoned the COHIBA mark during its period of non-use from 1987 to 1992.[2] Emmpresa Cubana Del Tabaco v. Culbro Corp., 213 F.Supp.2d 247, 267-71 (S.D.N.Y.2002) ("Emmpresa I"). The court dismissed General Cigar's affirmative defenses of acquiescence, estoppel, and laches.
 
 
 16
 In addition, the court dismissed Cubatabaco's claims under Articles 7 and 8 of the IAC, reasoning that under our decision in Havana Club, the only IAC rights that could be asserted under Sections 44(b) and (h) of the Lanham Act are those rights that are "related to the repression of unfair competition." Emmpresa I, 213 F.Supp.2d at 279-80. Because Articles 7 and 8 of the IAC relate to the registration of trademarks and are not found in the chapter of the IAC labeled "Repression of Unfair Competition," the court concluded that Article 7 and Article 8 rights could not be asserted under Sections 44(b) and (h) of the Lanham Act. Id. at 281-82. The District Court also dismissed Cubatabaco's Article 6bis Paris Convention claim, which Cubatabaco asserted under Sections 44(b) and (h) of the Lanham Act, on the ground that Article 6bis does not concern "rights related to the repression of unfair competition." Id. at 283-84. Finally, the court found that there were material issues of fact regarding Cubatabaco's New York common law and Federal Trademark Dilution Act claims and denied summary judgment to Cubatabaco on those claims. Id. at 284-86.
 
 
 17
 Both parties moved for reconsideration, and the District Court denied the motions. See Emmpresa Cubana del Tabaco v. Culbro Corp., No. 97 Civ. 8399, 2002 WL 31251005 (S.D.N.Y. Oct.8, 2002) ("Emmpresa II"). The court held a bench trial on various dates between May 27, 2003, and June 23, 2003. Empresa III, 2004 WL 602295, at *1.
 
 
 18
 On March 26, 2004, the District Court found that Cubatabaco was entitled to prevail on its claim of trademark infringement under Section 43(a) of the Lanham Act. The court's finding of trademark infringement rested on its adoption of the famous marks doctrine.
 
 
 19
 The court reasoned that, to prevail on its Section 43(a) trademark infringement claim, Cubatabaco had to establish (1) that its mark is entitled to protection and (2) that General Cigar's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of General Cigar's goods. Empresa III, 2004 WL 602295, at *29. The court recognized that the standard test for ownership of a mark is priority of use, and that, under the "territoriality principle," foreign use of a trademark cannot form the basis for establishing priority in the United States. Id. at *30. However, the court rejected General Cigar's argument that it owned the COHIBA mark because it was the first to use it in the United States after it was allegedly abandoned, stating that "General Cigar's priority of use ... is not the end of the matter." Id. Rather, the court held that "[u]nder the common-law well-known or famous marks doctrine, a party with a well known mark at the time another party starts to use the mark has priority over the party using the mark." Id. (internal quotation marks omitted). The court concluded that if the Cuban COHIBA mark was sufficiently famous in the United States before General Cigar resumed use of the mark in November 1992, then Cubatabaco owned the U.S. trademark even though it had never used the mark in the United States. The court determined that secondary meaning was the level of recognition required for a mark to be protected under the famous marks doctrine and concluded that the Cuban COHIBA mark was sufficiently well known in the United States by November 1992 that Cubatabaco was entitled to priority. The court further held that Cubatabaco had established a likelihood of confusion between the Cuban COHIBA and General Cigar's COHIBA mark, id. at * 39-49, and that Cubatabaco was therefore entitled to prevail on its claim of trademark infringement against General Cigar under Section 43(a) of the Lanham Act. Id. at *52.[3]
 
 
 20
 Although finding in Cubatabaco's favor on its claim of trademark infringement, the court dismissed the remainder of Cubatabaco's claims. In particular, the court dismissed Cubatabaco's claim that the band General Cigar used on its cigars infringed upon Cubatabaco's registered trade dress because Cubatabaco failed to show a likelihood of confusion between the cigar bands. Id. at * 56. The court dismissed Cubatabaco's Article 10bis Paris Convention claim and its claims under Articles 20 and 21 of the IAC as duplicative of Cubatabaco's rights under Section 43(a) of the Lanham Act. As to Cubatabaco's claim under the Federal Trademark Dilution Act ("FTDA"), 15 U.S.C. § 1125(c), the court found that Cubatabaco's COHIBA mark had not acquired the high level of fame required by that statute. Id. at *53. Cubatabaco's claim under New York's anti-dilution law, NY. Gen. Bus. Law § 360-l, was dismissed on similar grounds. Id. at *53-54. The court dismissed Cubatabaco's New York unfair competition claim because it found Cubatabaco failed to show that General Cigar acted in bad faith, id. at *55, dismissed Cubatabaco's misappropriation claim as duplicative of the New York unfair competition claim, id., and dismissed Cubatabaco's deceptive trade practices claim brought under New York General Business Law § 349 as not actionable, id. at 57. The court rejected Cubatabaco's request for cancellation of General Cigar's mark under 15 U.S.C. § 1120 because it had already canceled the registration based on the Section 43(a) violation and because Cubatabaco failed to establish that General Cigar made statements in its registration application with knowledge of their falsity. Id. at *55.
 
 
 21
 Finally, the court noted that the parties had stipulated in the Joint Pretrial Order that "[a]ny trial on the issue of monetary relief claimed by Plaintiff against Defendants shall be bifurcated from a trial on liability." Id. at *58. The court stated that if the parties wanted to seek appellate review of the court's liability determinations, they should file a motion for certification pursuant to Federal Rule of Civil Procedure 54(b), and the trial on monetary relief would be held at a later date. Id. Both parties filed motions for the court to enter judgment pursuant to Rule 54(b).
 
 
 22
 On May 6, 2004, the District Court entered an order, judgment, and permanent injunction, which, inter alia: (1) granted Cubatabaco judgment against General Cigar on its claim for infringement of Cubatabaco's COHIBA mark pursuant to 15 U.S.C. § 1125(a) and granted judgment to Cubatabaco on its claim that prior to November 1992 General Cigar had abandoned the COHIBA mark; (2) canceled General Cigar's trademark registration for the COHIBA mark, and permanently enjoined General Cigar from using the COHIBA mark; and (3) ordered General Cigar to deliver to Cubatabaco all goods and labels bearing the COHIBA mark, to recall from retail customers and distributors products bearing the mark, and to inform customers and distributors that they could not sell General Cigar's COHIBA-labeled products in the United States. Finally, the court stated that all of General Cigar's equitable and other affirmative defenses were dismissed with prejudice, and all of Cubatabaco's claims were dismissed with prejudice, except for the claims on which relief was granted. The court found that "[t]here was no reason to delay the appeal of plaintiff's claims for relief and defendants' equitable and other affirmative defenses that have been dismissed with prejudice," and "[i]n the interest of judicial efficiency and to avoid duplicative and piecemeal litigation about liability," the court entered final judgment pursuant to Federal Rule of Civil Procedure 54(b) on "all of the claims and defenses that have been dismissed to date."
 
 
 23
 The District Court denied General Cigar's motion to stay the order pending appeal, but entered a temporary stay to allow General Cigar to seek such a stay from this Court. On June 23, 2004, this Court granted a stay of the District Court's order pending appeal, and granted a motion to expedite the appeal.
 
 
 24
 On appeal, General Cigar argues that the District Court erred in (1) granting summary judgment to Cubatabaco on its claim that General Cigar had abandoned its 1981 trademark registration, and in holding that claims of abandonment are not subject to equitable defenses; and (2) granting judgment to Cubatabaco on its claim of trademark infringement based on a finding that Cubatabaco acquired rights to the mark under the famous marks doctrine. In addition, General Cigar asserts that Cubatabaco lacks standing to bring a Section 43(a) trademark infringement claim because, due to the embargo, Cubatabaco could not establish "commercial injury." General Cigar also makes an argument not raised below — that Cubatabaco's acquisition of trademark rights in the United States through the famous marks doctrine was a transfer of property that was prohibited by the Embargo Regulations.
 
 
 25
 In addition to defending the District Court's finding of trademark infringement under Section 43(a) of the Lanham Act, Cubatabaco cross-appeals arguing that: (1) Cubatabaco is entitled to protection of its "famous" COHIBA mark under Article 6bis of the Paris Convention, which Cubatabaco claims is implemented by Sections 44(b) and (h) of the Lanham Act; (2) General Cigar's registration for the U.S. COHIBA mark should be cancelled under Articles 7 and 8 of the IAC, which Cubatabaco claims are implemented through Sections 44(b) and (h) of the Lanham Act; (3) Cubatabaco is entitled to relief on its New York common law and its treaty-based unfair competition claims brought under Sections 44(b) and (h) of the Lanham Act; and (4) Cubatabaco is entitled to relief on its New York law dilution claim.
 
 
 26
 After oral argument in this Court we invited the United States Departments of Justice and Treasury ("government") to submit a brief as amicus curiae addressing the question of whether the Embargo Regulations barred Cubatabaco's acquisition of the COHIBA mark in the United States via the famous marks doctrine. On November 12, 2004, the government filed its letter brief. There, the government asserts that the Regulations bar Cubatabaco's acquisition of the mark via the famous marks doctrine and that the District Court's finding of trademark infringement under Section 43(a) must therefore be reversed. In addition, the government reasons that the portion of the District Court's order requiring General Cigar to deliver merchandise and other materials bearing the COHIBA mark to Cubatabaco is barred by the Regulations. According to the government, however, the Regulations do not bar the portion of the District Court's order that cancels General Cigar's registration and enjoins its use of the COHIBA mark. The government notes that Cubatabaco's ownership of the U.S. COHIBA mark is not required for a Section 43(a) claim, and expresses the view that, given the District Court's factual findings, the cancellation of General Cigar's mark and the injunction against General Cigar's use of the mark is appropriate relief. On December 3, 2004, the parties filed letter briefs responding to the amicus curiae letter brief filed by the government. Cubatabaco asserts that the government correctly concluded that it was entitled to the relief ordered by the District Court under Section 43(a) of the Lanham Act. General Cigar agrees with the government's conclusion that the Embargo Regulations barred Cubatabaco's acquisition of the mark through the famous marks doctrine, but asserts that the government is incorrect in its claim that Cubatabaco is nonetheless entitled to relief under Section 43(a).
 
 DISCUSSION
 
 27
 General Cigar argues that the Embargo Regulations bar Cubatabaco from acquiring rights in the COHIBA mark in the United States through the famous marks doctrine and that the District Court's finding of trademark infringement must therefore be reversed. Although General Cigar did not raise this argument below, we consider it on appeal because it implicates an issue of significant public concern — the United States' national policy towards Cuba as established by the President and the Congress — and it involves a question of pure law. See Dean Witter Reynolds, Inc. v. Fernandez, 741 F.2d 355, 360-61 (11th Cir.1984) (reaching issue regarding the Cuban embargo even though not raised below because "a principal purpose of the Cuban Assets Control Regulations was to deny Cuba access to American dollars which could finance acts of aggression or subversion," and therefore was an issue "of great public concern"); see also Singleton v. Wulff, 428 U.S. 106, 121, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases."); Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 142 (2d Cir.2000) ("[W]here an allegedly forfeited claim raises a pure question of law, we may choose to reach the merits." (internal quotation marks omitted)); Sheffield Commercial Corp. v. Clemente, 792 F.2d 282, 286 (2d Cir.1986) (considering issue not raised below regarding New York's Motor Vehicle Retail Installment Sales Act "because of the strong public interest in enforcement of the Act").
 
 
 28
 For the reasons explained below, we hold that the Embargo Regulations bar Cubatabaco's acquisition of property rights in the U.S. COHIBA trademark through the famous marks doctrine. Cubatabaco claims no other basis for owning the mark, and, therefore, the District Court's finding of trademark infringement under Section 43(a) of the Lanham Act must be reversed. We do not reach the question of whether to recognize the famous marks doctrine because even if a foreign entity can, as a general matter, acquire trademark rights in the United States through the famous marks doctrine, Cubatabaco's acquisition rights in the COHIBA mark in this manner is barred by the embargo. We also reject Cubatabaco's argument that, even if the embargo bars its acquisition of the mark, it nonetheless is entitled, based on the "fame" of its mark, to obtain cancellation of General Cigar's mark and an injunction barring General Cigar from using the mark in the United States because to grant this relief would entail a transfer of property rights in the COHIBA mark to Cubatabaco in violation of the embargo.
 
 
 29
 We also do not decide whether the District Court properly found that General Cigar had abandoned its mark between 1987 and 1992. We have no need to decide that issue because even if General Cigar did abandon its mark, it owns the mark now because it resumed use of the mark in November 1992 and Cubatabaco is unable, in light of the embargo, to establish that it acquired rights to the mark in the interval. Finally, we affirm the District Court's dismissal of Cubatabaco's remaining treaty claims and its claims under New York law.
 
 
 30
 I. CLAIMS UNDER SECTIONS 43(A), 44(B), AND 44(H) OF THE LANHAM ACT BASED ON "FAME" OF THE CUBAN COHIBA MARK....
 
 
 31
 
 A. The Trademark Infringement Claim Fails Because Acquisition of the Mark Via the Famous Marks Doctrine Is Prohibited By the Embargo Regulations
 
 
 
 32
 Cubatabaco argues that the District Court properly entered judgment in its favor on its claim of trademark infringement under Section 43(a) of the Lanham Act. To prove trademark infringement, Cubatabaco must establish that it owns the COHIBA mark in the United States. According to Cubatabaco, it owns the mark because General Cigar abandoned its 1981 COHIBA registration in 1987 and, by the time General Cigar resumed use of the mark in 1992, the Cuban COHIBA mark was sufficiently well known in the United States that it deserved protection under the famous marks doctrine. For the reasons explained below, we hold that the Embargo Regulations bar Cubatabaco's acquisition of the U.S. COHIBA mark through the famous marks doctrine, and thus the District Court's finding of trademark infringement is reversed.
 
 
 1. The Embargo Regulations
 
 
 33
 Unless otherwise authorized, the Embargo Regulations prohibit a broad range of transactions involving property in which a Cuban entity has an interest. In particular, 31 C.F.R. § 515.201(b) provides in pertinent part that:
 
 
 34
 (b) All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury (or any person, agency, or instrumentality designated by him) by means of regulations, rulings, instructions, licenses, or otherwise, if such transactions involve property in which any foreign country designated under this part, or any national thereof, has at any time on or since the effective date of this section had any interest of any nature whatsoever, direct or indirect:
 
 
 35
 (1) All dealings in, including, without limitation, transfers, withdrawals, or exportations of, any property or evidences of indebtedness or evidences of ownership of property by any person subject to the jurisdiction of the United States; and
 
 
 36
 (2) All transfers outside the United States with regard to any property or property interest subject to the jurisdiction of the United States.
 
 
 37
 31 C.F.R. § 515.201(b) (2005).[4] Section 515.201(c) provides that "[a]ny transaction for the purpose or which has the effect of evading or avoiding any of the prohibitions set forth in paragraphs (a) or (b) of this section is hereby prohibited." Id. § 515.201(c); see also Havana Club Holding, S.A. v. Galleon S.A., 203 F.3d 116, 122 n. 3 (2d Cir.), cert. denied, 531 U.S. 918, 121 S.Ct. 277, 148 L.Ed.2d 201 (2000).
 
 
 38
 The Regulations provide several relevant definitions. The "foreign country designated under this part" is Cuba, 31 C.F.R. § 515.201(d), and "property" or "property interest" includes trademarks, id. § 515.311. "Transfer" is defined broadly to include "any actual or purported act or transaction... the purpose, intent, or effect of which is to create, surrender, release, transfer, or alter, directly or indirectly, any right, remedy, power, privilege, or interest with respect to any property." Id. § 515.310. Section 515.309 provides that the phrase "transactions which involve property in which a designated foreign country, or any national thereof, has any interest of any nature whatsoever, direct or indirect includes ... [a]ny ... transfer to such designated foreign country or national thereof." Id. § 515.309(a). In other words, a transaction involving property in which a Cuban national has an interest includes a transfer of property to a Cuban national.
 
 
 39
 Therefore, absent a general or specific license, § 515.201(b)(1) of the Regulations prohibits a transfer of property rights, including trademark rights, to a Cuban entity by a person subject to the jurisdiction of the United States. Section 515.201(b)(2) prohibits a transfer outside of the United States of property subject to the jurisdiction of the United States — if the transfer is to a Cuban entity.
 
 
 40
 General licenses and specific licenses provide exceptions to the prohibition of § 515.201(b). General licenses are contained within the Regulations whereas specific licenses are granted by the OFAC in response to requests. See id. §§ 515.201(b), 515.317, 515.318.
 
 
 41
 A general license authorizing certain actions with respect to trademarks is provided at 31 C.F.R. § 515.527. The current version of the Regulations explicitly authorizes "[t]ransactions related to the registration and renewal in the United States Patent and Trademark Office or the United States Copyright Office of patents, trademarks, and copyrights in which the Government of Cuba or a Cuban national has an interest." Id. § 515.527(a)(1). The government asserts that the applicable version of the Regulations is the version in effect in 1992, when the allegedly prohibited transfer of trademark rights to Cubatabaco occurred. See Amicus Curiae Br. at 8. In 1992, § 515.527 provided that:
 
 
 42
 (1) The filing in the United States Patent Office of applications for letters patent and for trademarks registration;
 
 
 43
 (2) The making and filing in the United States Copyright Office of applications for registration or renewal of copyrights;
 
 
 44
 (3) The prosecution in the United States Patent Office of applications for letters patent and for trademarks registration;
 
 
 45
 (4) The receipt of letters patent or trademark registration certificates or copyright registration or renewal certificates granted pursuant to any such applications in which any designated national has at any time on or since the "effective date" had any interest.
 
 
 46
 31 C.F.R. § 515.527(a) (1992). Therefore, the 1992 Regulations did not include an authorization for "[t]ransactions related to the registration and renewal in the United States Patent and Trademark Office ... of ... trademarks." 31 C.F.R. § 515.527(a)(1).
 
 
 47
 Also relevant to our inquiry is the specific license that OFAC granted Cubatabaco in October 1997 before Cubatabaco initiated this action. This license, number C-18942, authorizes Cubatabaco to
 
 
 48
 initiate legal proceedings in the U.S. courts and to otherwise pursue their judicial remedies with respect to claims to the COHIBA trademark (the "Trademark") and against those persons that are alleged to be infringing upon the Trademark (collectively, the "Actions"); and Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C. (the "Firm"), and persons employed by, under the control of, or cooperating with the Firm, are hereby authorized to provide legal services to Cubatabaco and Habanos, S.A. in connection with the Actions, and to receive payment of professional fees and reimbursement for expenses incurred therefor from or on behalf of the Cubatabaco and/or Habanos, S.A., provided that payments of fees, retainers, and other payments originate from a source not currently within the United States, or within the possession or control of a person subject to U.S. jurisdiction, and such payment is not made from a blocked account or blocked funds.
 
 
 49
 Accordingly, we must determine whether Cubatabaco's acquisition of the U.S. COHIBA mark is a transfer that is prohibited by § 515.201(b), and if so, whether it is nonetheless authorized either by § 515.527, or by the specific license granted to Cubatabaco by the OFAC.
 
 
 2. Prohibited Transfers
 
 
 50
 We hold that Cubatabaco's acquisition of the U.S. COHIBA mark through the famous marks doctrine would constitute a transfer that is prohibited by § 515.201(b), and such transfers are not authorized by a general or specific license.
 
 
 51
 
 a. General Prohibition: 515.201(b)
 
 
 
 52
 Cubatabaco's acquisition of the U.S. COHIBA mark through the famous marks doctrine is barred by 31 C.F.R. § 515.201(b)(2), which prohibits "transfers outside the United States with regard to any property or property interest subject to the jurisdiction of the United States" if the transfer involves property in which a Cuban entity has an interest. 31 C.F.R. § 515.201(b)(2).
 
 
 53
 A transaction involving property in which a Cuban entity has an interest includes a transfer of property to a Cuban entity. "Property" includes trademarks, id. § 515.311, and "transfers outside the United States" of United States trademark rights to Cuban entities are prohibited by § 515.201(b)(2). "Transfer" is broadly defined to include "any... act ... the ... effect of which is to create ... any right, remedy, power, privilege, or interest with respect to property." Id. § 515.310. Cubatabaco's acquisition of the mark is a "transfer[ ] outside the United States with regard to any property or property interest subject to the jurisdiction of the United States," id. § 515.201(b)(2), because Cubatabaco's acquisition of the mark is a transfer of U.S. property rights from inside the United States to Cuba — a location "outside of the United States." Therefore, Cubatabaco's acquisition of the U.S. COHIBA mark through the famous marks doctrine is barred by § 515.201(b)(2).
 
 
 54
 Cubatabaco argues that the Embargo Regulations "regulate[] transactions involving property in which a Cuban national has, or had, an interest, not their legal effect." Appellee Br. at 58. In other words, Cubatabaco claims that if the acts that made the Cuban COHIBA famous were permitted under the Regulations, Cubatabaco's acquisition of the mark through operation of the famous marks doctrine is permitted. We reject this argument because there is no doubt that acquisition of property through operation of law is covered by § 515.201(b). As the government asserts, "[r]egardless of whether the acquisition of the COHIBA mark through the famous marks doctrine is characterized as an `effect' of other actions or not, it nevertheless falls within the Regulations' definition of a `transaction' involving property in which a Cuban national has an interest." Amicus Curiae Br. at 7. The Regulations explicitly permit specific "transfers by operation of law," including "[a]ny transfer to any person by intestate succession," 31 C.F.R. § 515.525(a)(2), and transfers arising "solely as a consequence of the existence or change of marital status," id. § 515.525(a)(1). These provisions would not be necessary if § 515.201's prohibitions did not cover transfers by operation of law.
 
 
 55
 Our conclusion is consistent with the views expressed by the United States in its amicus curiae brief. The United States concludes that "[u]nder the plain language of these regulations, the acquisition of the trademark by Cubatabaco in 1992 through the famous marks doctrine, as found by the district court, created or vested a property right in Cubatabaco, and was therefore prohibited absent a general or specific license." Amicus Curiae Br. at 7. Because we conclude that § 515.201(b)(2) clearly bars Cubatabaco's acquisition of the COHIBA mark through the famous marks doctrine, we need not determine what level of deference is owed to the U.S. Department of Treasury's interpretation of the Embargo Regulations. Cf. Havana Club, 203 F.3d at 125 (noting that the interpretation of a provision of the Embargo Regulations "given by the agency charged with enforcing the embargo is normally controlling").[5]
 
 
 56
 
 b. General and Specific Licenses
 
 
 
 57
 Because the acquisition of the U.S. COHIBA mark by Cubatabaco through the famous marks doctrine is a prohibited transfer under § 515.201, it is barred unless authorized by a general or specific license.
 
 
 58
 The general license contained in the 1992 version of § 515.527 does not authorize Cubatabaco's acquisition of the COHIBA mark through the famous marks doctrine. With respect to trademarks, that version of § 515.527 permitted only the filing of applications for trademark registrations, id. § 515.527(a)(1), and "[t]he receipt of ... trademark registration certificates ... or renewal certificates granted pursuant to any such applications," id. § 515.527(a)(4). Clearly, neither of these provisions authorized Cubatabaco's acquisition of the mark through the famous marks doctrine. In addition, even if we applied the current version of § 515.527, which authorizes transactions "related to the registration and renewal" of trademarks in the United States Patent and Trademark Office, we would not read the provision to authorize acquisition of the mark through the famous marks doctrine, as acquisition of a mark through the famous marks doctrine is wholly outside the process of registering the mark with the PTO. See Havana Club, 203 F.3d at 123-24 (holding that the "related to" language of § 515.527(a)(1) should be interpreted narrowly as it creates an exception to the broad prohibitions of the embargo).[6]
 
 
 59
 Finally, the special license issued by OFAC to Cubatabaco, which allows Cubatabaco to "pursue ... judicial remedies with respect to claims to the COHIBA trademark," does not permit acquisition of the mark via the famous marks doctrine. This license allows Cubatabaco to seek relief in U.S. courts, but does not authorize transfers of property barred by the Regulations. This is also the view of the government. See Amicus Curiae Br. at 10 ("[The OFAC license] does not retroactively authorize the acquisition found by the district court. The most obvious reading of this license is that it allows Cubatabaco to seek remedies but does not alter the substantive law for a court to apply in determining what, if any, remedies are appropriate.")
 
 
 60
 Accordingly, Cubatabaco's acquisition of the U.S. COHIBA mark through the famous marks doctrine is barred by the Regulations. We reverse the District Court's finding of trademark infringement under Section 43(a) of the Lanham Act, as that finding was based on the District Court's conclusion that Cubatabaco acquired the COHIBA mark through the famous marks doctrine.
 
 
 61
 
 B. Cubatabaco's Claims for Injunctive Relief Based on Section 43(a) and the Paris Convention Fail Because They Entail a Transfer of Property Rights to Cubatabaco in Violation of the Embargo
 
 
 
 62
 Cubatabaco argues that even if the Regulations bar its acquisition of the U.S. COHIBA mark, it is entitled to obtain cancellation of General Cigar's registration of the COHIBA mark and an injunction preventing General Cigar from using the mark in the United States because its mark was famous in the United States before General Cigar recommenced its use in November 1992. Cubatabaco maintains that this relief is warranted under Section 43(a) of the Lanham Act, as well as under Article 6bis of the Paris Convention, which it claims is implemented by Sections 44(b) and (h) of the Lanham Act even if full transfer of the COHIBA mark to Cubatabaco is prohibited.
 
 
 63
 As an initial matter, we find that granting Cubatabaco the injunctive relief sought would effect a transfer of property rights to a Cuban entity in violation of the embargo. There is no contest that, as matters stand, General Cigar has the full panel of property rights in the COHIBA mark, including the right to exclude or limit others seeking to use the mark in the United States. Invoking Sections 43(a), 44(b), and 44(h) of the Lanham Act and treaty duties owed by a state party to the Paris Convention, Cubatabaco seeks to exclude General Cigar from commercial use of the COHIBA mark in the United States. There is no doubt that granting this relief to Cubatabaco would entail a transfer from General Cigar to Cubatabaco of a "right, remedy, power, privilege, or interest with respect to [the COHIBA mark]." 31 C.F.R. § 515.310. As it is exactly this brand of property right transfer that the embargo prohibits, we cannot sanction a grant of injunctive remedy to Cubatabaco in the form of the right, privilege, and power to exclude General Cigar from using its duly registered mark. As described below, this limitation on judicial authority applies equally to Cubatabaco's Lanham Act and Paris Convention claims.
 
 
 64
 
 1. Section 43(a) Claim for Unfair Competition
 
 
 
 65
 In response to the amicus curiae brief submitted by the United States, Cubatabaco argues that even if acquisition of the U.S. COHIBA mark is barred by the Embargo Regulations and Cubatabaco cannot bring a trademark infringement claim under Section 43(a) of the Lanham Act, it nonetheless should obtain, under Section 43(a), cancellation of General Cigar's mark and an injunction against General Cigar's use of the mark.[7] Cubatabaco asserts that the government correctly concludes that ownership of a mark is not required for a Section 43(a) claim of unfair competition, and that the District Court's factual findings support the conclusion that General Cigar violated Section 43(a).[8]
 
 
 66
 Cubatabaco did not litigate this Section 43(a) claim in the District Court. The only Section 43(a) claim that Cubatabaco brought was a claim for trademark infringement. Cubatabaco did initially assert in its complaint several non-trademark infringement claims under Section 43(a), but it stipulated to dismissal of those claims with prejudice after our decision in Havana Club. Cubatabaco argues, however, that "the United States' construction of the Lanham Act is properly before this Court" and "[a]ny supposed delay in advancing legal theories supporting affirmance is solely attributable to [General Cigar's] own failure to raise its [Embargo Regulations] arguments until appeal." Appellee Letter Br. at 14. Because Cubatabaco might have litigated in the District Court a claim of the type imagined by the United States had General Cigar argued below that the Regulations barred Cubatabaco's acquisition of the U.S. COHIBA mark through the famous marks doctrine, we address Cubatabaco's argument that the relief ordered by the District Court was appropriate even if the embargo prevents Cubatabaco from owning the U.S. COHIBA mark.
 
 
 67
 Adopting the views set forth in the amicus curiae brief filed by the United States, Cubatabaco argues that even if General Cigar owns the COHIBA mark in the United States, Cubatabaco can prevail in a Section 43(a) claim against General Cigar on the theory that General Cigar's use of the COHIBA mark in the United States causes consumer confusion. In support of this argument, Cubatabaco argues that Section 43(a) "goes beyond trademark protection." Appellee Letter Br. at 8.
 
 
 68
 While it is true that Section 43(a) "goes beyond trademark protection," Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 28, 123 S.Ct. 2041, 156 L.Ed.2d 18 (2003), to prohibit market behavior that may "deceive consumers and impair a producer's goodwill," id. at 32, 123 S.Ct. 2041, through "the deceptive and misleading use of marks... ' § 43(a) can never be a federal codification of the overall law of unfair competition,' but can apply only to certain unfair trade practices prohibited by its text," id. at 28-29, 123 S.Ct. 2041 (quoting 4 J. McCarthy Trademarks and Unfair Competition § 27:7, p 27-14 (4th ed.2002) (internal quotation marks omitted)). Specifically, Section 43(a) includes causes of action grounded in allegations of "false or misleading description of fact," "false or misleading representation of fact," or false designation of geographic origin.
 
 
 69
 None of these theories need detain us here, however, because the case before us turns on the right to use the COHIBA mark, putting it well within the category of Section 43(a) cases that involve claims "for infringement of rights in a mark acquired by use." Virgin Enterps., Ltd. v. Nawab, 335 F.3d 141, 146 (2d Cir.2003); see also 4 McCarthy, supra, § 27:9 ("[Section] 43(a) gradually developed through judicial construction into the foremost federal vehicle for the assertion of two major and distinct types of `unfair competition': (1) infringement of even unregistered marks, names and trade dress, and (2) `false advertising.' .... [I]n 1989, Congress codified the two-prongs...."). Cubatabaco stipulated to the dismissal of its false advertising claim and is not attempting to argue that General Cigar is engaging in any form of false advertising.[9]
 
 
 70
 Therefore, the cases that provide the closest analogues to the case at bar are those like Genesee Brewing Co., Inc. v. Stroh Brewing Co., 124 F.3d 137 (2d Cir.1997), where we held that although Genesee could not prevail in a claim for trademark infringement under Section 43(a) against Stroh because the phrase "Honey Brown," which it was seeking to protect, was generic as applied to Stroh's ale beer, "[t]he fact that Genesee's mark is generic as applied to Stroh's product ... does not preclude a finding that Stroh has violated the Lanham Act by engaging in unfair competition." Id. at 149. In Genesee, the plaintiff's ability to bring a claim for confusion against a defendant using a particular trademark in commerce depended on the plaintiff showing that it was the first to use the mark in commerce. The plaintiff in Genesee was not attempting to assert a Section 43(a) unfair competition claim against a defendant who owned the mark at issue — rather, the claim was against a defendant who was using a generic mark subsequent to the plaintiff's use of the mark.
 
 
 71
 Cubatabaco's theory is that General Cigar's sale of COHIBA cigars in the United States violates Section 43(a) because it is likely to cause consumer confusion as to the source or attribution of those cigars. The confusion alleged by Cubatabaco in support of its Section 43(a) claim is derived solely from General Cigar's use of the COHIBA mark. Cubatabaco cannot obtain relief on a theory that General Cigar's use of the mark causes confusion, because, pursuant to our holding today, General Cigar's legal right to the COHIBA mark has been established as against Cubatabaco. General Cigar has a right to use the mark in the United States because it owns the mark in the United States.
 
 
 72
 In Part IA of this opinion we held that General Cigar has priority rights to the COHIBA mark in the United States as against Cubatabaco. See supra at page 472-76. To allow Cubatabaco to prevail on a claim of unfair competition against General Cigar and to obtain an injunction prohibiting General Cigar from using the mark would turn the law of trademark on its head. None of United States law, the facts in this case, or international treaties warrants such acrobatics in this case. We therefore find that, on the facts of this case, Cubatabaco's Section 43(a) claim seeking an injunction against General Cigar's use of its duly registered COHIBA mark cannot succeed as a matter of law.
 
 
 73
 We do not find the analysis offered by the government and by Cubatabaco in defense of the recast Section 43(a) claim persuasive. It may be true that, as the government argues, "Cubatabaco's foreign registrations give it the right to register its COHIBA mark [in the United States], absent General Cigar's registration." Amicus Curiae Br. at 12. That is, however, a hypothetical circumstance upon which we need not speculate. As we hold today, General Cigar does have a valid registration on the COHIBA mark in the United States. Further, while it may be true, as the government points out, that Cubatabaco's COHIBA mark "was `famous' and had secondary meaning in the United States before General Cigar's first use [of its COHIBA mark]," id., we have already held that this fact cannot justify a transfer of property rights in the COHIBA mark to Cubatabaco via the "famous marks doctrine." We see no reason to alter that holding to allow Cubatabaco to achieve the same transfer via a route that is one step more circuitous than the path rejected above.
 
 
 2. Article 6bis Paris Convention
 
 
 74
 Cubatabaco maintains that even if the Regulations bar its acquisition of the mark, and even if it cannot obtain relief for an unfair competition claim under Section 43(a), it has a right under Article 6bis of the Paris Convention, in conjunction with Sections 44(b) and (h) of the Lanham Act, to obtain cancellation of General Cigar's mark and an injunction against its use.
 
 
 75
 Article 6bis of the Paris Convention provides that:
 
 
 76
 (1) The countries of the Union undertake, ex officio if their legislation so permits, or at the request of an interested party, to refuse or to cancel the registration, and to prohibit the use, of a trademark which constitutes a reproduction, an imitation, or a translation, liable to create confusion, of a mark considered by the competent authority of the country of registration or use to be well known in that country as being already the mark of a person entitled to the benefits of this Convention and used for identical or similar goods. These provisions shall also apply when the essential part of the mark constitutes a reproduction of any such well-known mark or an imitation liable to create confusion therewith.
 
 
 77
 (2) A period of at least five years from the date of registration shall be allowed for requesting the cancellation of such a mark. The countries of the Union may provide for a period within which the prohibition of use must be requested.
 
 
 78
 (3) No time limit shall be fixed for requesting the cancellation or the prohibition of the use of marks registered or used in bad faith.
 
 
 79
 Paris Convention, Art. 6bis, 21 U.S.T. at 1640.
 
 
 80
 Both the United States and Cuba are parties to the Paris Convention. Id. at 1669, 1676.
 
 
 81
 According to Cubatabaco, Sections 44(b) and (h) incorporate treaty provisions relating to the "repression of unfair competition," and rights under Article 6bis fall into that category. Section 44(b) provides that:
 
 
 82
 Any person whose country of origin is a party to any convention or treaty relating to trademarks, trade or commercial names, or the repression of unfair competition, to which the United States is also a party, or extends reciprocal rights to nationals of the United States by law, shall be entitled to the benefits of this section under the conditions expressed herein to the extent necessary to give effect to any provision of such convention, treaty or reciprocal law, in addition to the rights to which any owner of a mark is otherwise entitled by this chapter.
 
 
 83
 15 U.S.C. § 1126(b). Therefore, Cubatabaco is entitled to the benefits of Section 44, "under the conditions expressed herein," but only to the extent necessary to give effect to any provision of a treaty. Section 44(h) provides:
 
 
 84
 Any person designated in subsection (b) of this section as entitled to the benefits and subject to the provisions of this chapter shall be entitled to effective protection against unfair competition, and the remedies provided in this chapter for infringement of marks shall be available so far as they may be appropriate in repressing acts of unfair competition.
 
 
 85
 Id. § 1126(h). "Rights under Section 44(h) are co-extensive with treaty rights under section 44(b), including treaty rights `relating to ... the repression of unfair competition.' "Havana Club, 203 F.3d at 134 (quoting 15 U.S.C. § 1126(b)); see also Mattel, Inc. v. MCA Records, Inc., 296 F.3d 894, 907 (9th Cir.2002) ("`[T]he grant in subsection (h) of effective protection against unfair competition is tailored to the provisions of the unfair competition treaties by subsection (b), which extends the benefits of section 44 only to the extent necessary to give effect to the treaties.' Subsection 44(h) creates a federal right that is coextensive with the substantive provisions of the treaty involved." (quoting Toho Co. v. Sears, Roebuck & Co., 645 F.2d 788, 792 (9th Cir.1981) (citation omitted))).
 
 
 86
 Cubatabaco may be correct that Sections 44(b) and (h) incorporate Article 6bis and allow foreign entities to acquire U.S. trademark rights in the United States if their marks are sufficiently famous in the United States before they are used in this country. That is the view expressed by some commentators. See 4 McCarthy on Trademarks and Unfair Competition § 29:4 (4th ed. 2004) ("In the author's view, the well-known or famous marks doctrine of Paris Convention Article 6bis is incorporated into United States domestic law though the operation of Lanham Act § 43(a), § 44(b) and § 44(h)." (footnote omitted)).[10]
 
 
 87
 However, we need not decide that broad question here because even assuming that the famous marks doctrine is otherwise viable and applicable, the embargo bars Cubatabaco from acquiring property rights in the U.S. COHIBA mark through the doctrine. The Embargo Regulations do not permit Cubatabaco to acquire the power to exclude General Cigar from using the mark in the United States. We do not read Article 6bis and Section 44(b) and (h) of the Lanham Act to require cancellation of General Cigar's properly registered trademark or an injunction against its use of the mark in the United States under these circumstances.
 
 
 88
 In any event, to the extent that the Paris Convention, standing alone, might pose an irreconcilable conflict to the Regulations, the latter will prevail. "[A]n act of congress ought never to be construed to violate the law of nations, if any other possible construction remains." Weinberger v. Rossi, 456 U.S. 25, 32, 102 S.Ct. 1510, 71 L.Ed.2d 715 (1982) (quotations and citations omitted). However, as we have recently recalled, "legislative acts trump treaty-made international law" when those acts are passed subsequent to ratification of the treaty and clearly contradict treaty obligations. United States v. Yousef, 327 F.3d 56, 110 (2d Cir.2003) (citing Breard v. Greene, 523 U.S. 371, 376, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998)); see also Whitney v. Robertson, 124 U.S. 190, 194, 8 S.Ct. 456, 31 L.Ed. 386 (1888) (if a treaty and a federal statute conflict, "the one last in date will control the other"). The most recent iteration of the Paris Convention was ratified by the United States in 1970, see 21 U.S.T. 1583; whereas the Regulations were reaffirmed and codified in 1996 with the passage of the LIBERTAD Act, 110 Stat. 792 (1996), 22 U.S.C. § 6032(h). In these circumstances, any claim grounded in the Paris Convention that presented an irreconcilable conflict with the Regulations would be rendered "null" by the Regulations. Breard, 523 U.S. at 376, 118 S.Ct. 1352.
 
 
 89
 II. OTHER TREATY CLAIMS BROUGHT UNDER SECTIONS 44(B) AND (H) OF THE LANHAM ACT
 
 
 A. Articles 7 and 8 of the IAC
 
 
 90
 Cubatabaco argues that the District Court erred in dismissing its claims under Articles 7 and 8 of the Inter-American Convention. Both the United States and Cuba are parties to the IAC. See IAC, Art. 13, 46 Stat. 2907, 2946-47; Havana Club Holding, S.A. v. Galleon S.A., 203 F.3d 116, 121 (2d Cir.), cert. denied, 531 U.S. 918, 121 S.Ct. 277, 148 L.Ed.2d 201 (2000).
 
 
 91
 Articles 7 and 8 appear in the chapter of the IAC entitled "Trademark Protection." Article 7 provides that:
 
 
 92
 Any owner of a mark protected in one of the Contracting States in accordance with its domestic law, who may know that some other person is using or applying to register or deposit an interfering mark in any other of the Contracting States, shall have the right to oppose such use, registration or deposit and shall have the right to employ all legal means, procedure or recourse provided in the country in which such interfering mark is being used or where its registration or deposit is being sought, and upon proof that the person who is using such mark or applying to register or deposit it, had knowledge of the existence and continuous use in any of the Contracting States of the mark on which opposition is based upon goods of the same class, the opposer may claim for himself the preferential right to use such mark in the country where the opposition is made or priority to register or deposit it in such country, upon compliance with the requirements established by the domestic legislation in such country and by this Convention.
 
 
 93
 IAC, Art. 7, 46 Stat. at 2918-19. Article 8 provides that:
 
 
 94
 When the owner of a mark seeks the registration or deposit of the mark in a Contracting State other than that of origin of the mark and such registration or deposit is refused because of the previous registration or deposit of an interfering mark, he shall have the right to apply for and obtain the cancellation or annulment of the interfering mark upon proving, in accordance with the legal procedure of the country in which cancellation is sought, the stipulations in Paragraph (a) and those of either Paragraph (b) or (c) below:
 
 
 95
 (a) That he enjoyed legal protection for his mark in another of the Contracting States prior to the date of the application for the registration or deposit which he seeks to cancel; and
 
 
 96
 (b) that the claimant of the interfering mark, the cancellation of which is sought, had knowledge of the use, employment, registration or deposit in any of the Contracting States of the mark for the specific goods to which said interfering mark is applied, prior to adoption and use thereof or prior to the filing of the application or deposit of the mark which is sought to be cancelled; or
 
 
 97
 (c) that the owner of the mark who seeks cancellation based on a prior right to the ownership and use of such mark, has traded or trades with or in the country in which cancellation is sought, and that goods designated by his mark have circulated and circulate in said country from a date prior to the filing of the application for registration or deposit for the mark, the cancellation which is claimed, or prior to the adoption and use of the same.
 
 
 98
 IAC, Art. 8, 46 Stat. at 2920-21.
 
 
 99
 According to Cubatabaco, Articles 7 and 8 of the IAC "grant the owner of a trademark in one country (Cuba) the priority to register and to use the mark in another country (the U.S.), as against one ([General Cigar]) who had knowledge of the treaty national's prior use or registration (Cubatabaco's use or registration in Cuba)." Appellee's Br. at 85. Cubatabaco argues that under Articles 7 and 8, "[i]f the foreign treaty national's application to register the mark would otherwise be refused, it can cancel the `interfering' registration" and "has the `right to oppose such use.'" Id.
 
 
 100
 Cubatabaco asserts that it is entitled to relief for its claims under Articles 7 and 8 of the IAC under Sections 44(b) and (h) of the Lanham Act. In Havana Club, however, we noted that a foreign entity may not assert a claim under Article 23 of the IAC pursuant to Section 44(h) of the Lanham Act "because the IAC does not treat rights under Article 23 as rights related to the repression of unfair competition."[11] Havana Club, 203 F.3d at 135 n. 19. Following our holding in Havana Club, the District Court concluded that Cubatabaco could not assert rights under Articles 7 and 8 of the IAC pursuant to Section 44(h) of the Lanham Act because Articles 7 and 8 are not related to the repression of unfair competition. The court noted that Chapter IV of the IAC, which includes Articles 20, 21, and 22, is entitled "Repression of Unfair Competition," whereas Articles 7 and 8 of the IAC are located in Chapter II, which is entitled "Trademark Protection." Emmpresa I, 213 F.Supp.2d at 281. Furthermore, the court said that Articles 7 and 8 relate to priority of registration and under Section 44(d) Congress "specifically carved out how owners of trademarks registered in other countries may obtain a U.S. registration." Id.
 
 
 101
 We agree with the District Court that Cubatabaco cannot assert claims under Articles 7 and 8 pursuant to Section 44(h) of the Lanham Act because Articles 7 and 8 do not relate to the repression of unfair competition. As General Cigar points out, Congress enacted Section 44(d) of the Lanham Act to implement treaty rights regarding priority of foreign registrants. Under Section 44(d), a foreign entity, whose country of origin is a party to a trademark treaty to which the United States is also a party, can secure priority in the United States from the date of its foreign registration as long as it registers in the United States within six months of the date of its foreign registration and it states that it has "a bona fide intention to use the mark in commerce." 15 U.S.C. § 1126(d). Foreign entities are entitled to this benefit regardless of whether a domestic registrant or user had knowledge of the prior foreign registration or use. Thus, although Section 44(d) contains a time limit, the priority rights it provides for foreign entities are broader than Articles 7 and 8 of the IAC. Congress implemented Articles 7 and 8 through Section 44(d) of the Lanham Act and those provisions do not relate to the "repression of unfair competition" within the meaning of Section 44(h). Accordingly, we hold that Cubatabaco cannot assert Article 7 or Article 8 rights under Sections 44(b) and (h) of the Lanham Act. The District Court properly dismissed these claims.
 
 
 B. Treaty-Based Unfair Competition Claims
 
 
 102
 Cubatabaco argues that the District Court erred in dismissing its claims under Articles 20 and 21 of the IAC,[12] and Article 10bis of the Paris Convention,[13] all of which Cubatabaco asserted pursuant to Sections 44(b) and (h) of the Lanham Act.
 
 
 103
 In Havana Club we dismissed a claim for unfair competition brought by the plaintiff under Article 21(c) of the IAC and Section 44(h) of the Lanham Act. We noted that Article 21 of the IAC "authorizes the prohibition of its specified acts of unfair competition `unless otherwise effectively dealt with under the domestic laws of the Contracting States.' "Havana Club, 203 F.3d at 134 (quoting IAC, Art. 21, 46 Stat. at 2932). We held that Section 43(a) already effectively prohibited the conduct covered by Article 21(c) of the IAC and dismissed the IAC claim. That holding applies here. Cubatabaco does not claim that Article 21 prohibits a broader range of conduct than Section 43(a) of the Lanham Act. Appellant Reply Br. at 22. Therefore, Cubatabaco cannot bring a claim under Article 21 of the IAC pursuant to Sections 44(b) and (h). To the extent Cubatabaco is attempting to raise claims under IAC Article 20, that provision does not provide a separate basis for relief because it is implemented through Section 43(a) of the Lanham Act.
 
 
 104
 In addition, Cubatabaco cannot maintain a claim for unfair competition under Article 10bis of the Paris Convention pursuant to Sections 44(b) and (h) of the Lanham Act. The Paris Convention requires that "foreign nationals ... be given the same treatment in each of the member countries as that country makes available to its own citizens." Vanity Fair Mills v. T. Eaton Co., 234 F.2d 633, 640 (2d Cir.), cert. denied, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956). "[T]he Paris Convention provides for national treatment, and does not define the substantive law of unfair competition." Mattel, Inc. v. MCA Records, Inc., 296 F.3d 894, 908 (9th Cir.2002). As the Eleventh Circuit has explained:
 
 
 105
 We agree that section 44 of the Lanham Act incorporated, to some degree, the Paris Convention. But we disagree that the Paris Convention creates substantive rights beyond those independently provided in the Lanham Act. As other courts of appeals have noted, the rights articulated in the Paris Convention do not exceed the rights conferred by the Lanham Act. Instead, we conclude that the Paris Convention, as incorporated by the Lanham Act, only requires "national treatment."
 
 
 106
 National treatment means that "foreign nationals should be given the same treatment in each of the member countries as that country makes available to its own citizens." So, section 44 of the Lanham Act gives foreign nationals the same rights and protections provided to United States citizens by the Lanham Act. As such, foreign nationals like Plaintiff may seek protection in United States courts for violations of the Lanham Act. But the Paris Convention, as incorporated by section 44 of the Lanham Act, creates no new cause of action for unfair competition. Any cause of action based on unfair competition must be grounded in the substantive provisions of the Lanham Act.
 
 
 107
 Int'l Cafe, S.A.L. v. Hard Rock Cafe Int'l (U.S.A.), Inc., 252 F.3d 1274, 1277-78 (11th Cir.2001) (citations omitted). Therefore, we conclude that Cubatabaco cannot maintain a separate claim for unfair competition under Article 10bis and Sections 44(b) and (h). Rather, a claim for unfair competition must be brought under Section 43(a) or state law. See Mattel, 296 F.3d at 908.[14]
 
 III. STATE LAW CLAIMS
 
 108
 Cubatabaco also argues that the District Court erred in dismissing its New York unfair competition claim, and its claim under New York's anti-dilution statute, N.Y. Gen. Bus. Law § 360-l.[15] We affirm the dismissal of both of these claims.
 
 
 109
 The District Court found that General Cigar had not acted in bad faith by using the COHIBA name, and, because bad faith must be demonstrated for a claim of unfair competition under New York law, Cubatabaco's claim should be dismissed. We agree. A plaintiff claiming unfair competition under New York law must show that the defendant acted in bad faith. See Genesee Brewing Co., Inc. v. Stroh Brewing Co., 124 F.3d 137, 149 (2d Cir.1997) ("The district court was correct that Genesee's state law claim of unfair competition is not viable without a showing of bad faith."); Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc., 58 F.3d 27, 35 (2d Cir.1995) (stating that in "a common law unfair competition claim under New York law" there "must be some showing of bad faith"). We find no error in the District Court's bad faith determination and therefore affirm the dismissal of the claim.
 
 
 110
 We affirm the District Court's dismissal of Cubatabaco's claim of dilution under New York General Business Law § 360-l. Cubatabaco has failed to establish that it owns the COHIBA mark and cannot prevail on a claim of dilution. See The Sports Authority, Inc. v. Prime Hospitality Corp., 89 F.3d 955, 966 (2d Cir.1996) ("To establish a trademark dilution claim under New York law, TSA must show ownership of a distinctive mark and a likelihood of dilution.").
 
 CONCLUSION
 
 111
 For the foregoing reasons, the judgment of the District Court is affirmed in part, reversed in part, and remanded for entry of an order dismissing all remaining claims. We vacate those portions of the District Court's order that cancel General Cigar's registration, enjoin its use of the mark, order it to deliver materials to Cubatabaco, and require it to recall from retail customers and distributors products bearing the mark, and to inform customers and distributors that they cannot sell General Cigar's COHIBA-labeled products in the United States.
 
 
 
 Notes:
 
 
 [1]
 The stipulation stated that the dismissal was with prejudice, except that dismissal would be without prejudice if the Supreme Court reversed or vacated certain portions of this Court's decision inHavana Club.
 
 
 [2]
 Because we reverse on other grounds, we need not address the District Court's finding that General Cigar did, in fact, abandon the COHIBA mark. However, we do note that the District Court citedSilverman for the premise that "defendants must come forward with objective, hard evidence of actual `concrete plans to resume use' in the `reasonably foreseeable future when the conditions requiring suspension abate.' "Emmpresa I, 213 F.Supp.2d at 268. We do not agree that Silverman imposed such a heavy burden. Silverman required that, to overcome a presumption of abandonment after a sufficiently long period of non-use, a defendant need show only an intention to resume use "within the reasonably foreseeable future." Silverman, 870 F.2d at 46.
 
 
 [3]
 The court also rejected General Cigar's claim that Cubatabaco had abandoned the COHIBA mark between 1992 and 1997Empresa III, 2004 WL 602295, at *52.
 
 
 [4]
 We need not decide whether the current version of the Regulations or the 1992 version — the version in effect at the time Cubatabaco alleges it acquired rights to the U.S. COHIBA mark — applies. Except with respect to 31 C.F.R. § 515.527, all the provisions that we consider have either remained unchanged since 1992 or have changed in a manner immaterial to the issues raised here. As we discussinfra at page 476, although § 515.527 has been amended since 1992, neither the current version nor the 1992 version authorizes Cubatabaco's acquisition of the mark via the famous marks doctrine.
 
 
 [5]
 Theamicus curiae brief cites § 515.201(b)(1) and does not specifically address § 515.201(b)(2). Section 515.201(b)(1) prohibits "transactions," including "transfers," involving property in which a Cuban entity has an interest by any person subject to the jurisdiction of the United States. 31 C.F.R. § 515.201(b)(1). Therefore, § 515.201(b)(1) prohibits transfers of trademarks to Cuban entities by persons subject to the jurisdiction of the United States. The District Court's holding that Cubatabaco's mark was sufficiently famous in 1992 for property rights to attach could be viewed as a transfer of property rights to Cubatabaco by a "person subject to the jurisdiction of the United States." The United States does not address that particular point, and we need not resolve it because Cubatabaco's acquisition of the mark through the famous marks doctrine is plainly barred by § 515.201(b)(2).
 
 
 [6]
 Indeed, Cubatabaco does not appear to be arguing that § 515.527(a)(1) permits acquisition through the famous marks doctrine. Instead, Cubatabaco argues that (1) its acquisition of the mark is not prohibited by § 515.201(b) because that section does not cover transfers by operation of law and (2) its acquisition of the mark is in any event permitted by the special license granted to it by the OFAC
 
 
 [7]
 Section 43(a)(1) of the Lanham Act provides:
 (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which —
 (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
 (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
 shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
 15 U.S.C. § 1125(a)(1).
 
 
 [8]
 The government argues that canceling General Cigar's mark, enjoining General Cigar's use of the mark, and requiring General Cigar to recall goods and labels bearing the mark, based on a finding of unfair competition under Section 43(a), is not barred by the Embargo Regulations
 
 
 [9]
 Section 43(a) also "goes beyond trademark protection" in the sense that the provision can be used to protect trade dress or to protect against other forms of product infringement. But this is not a case about trade dress — Cubatabaco originally brought a trade dress infringement claim but has not appealed the District Court's dismissal of the claim. This is, rather, a case about which entity owns the COHIBA trademark in the United States, and — principally because we hold that the Regulations prohibit transfer of any property right in the COHIBA mark to Cubatabaco — we hold today that General Cigar, and not Cubatabaco, owns the COHIBA trademark in the United States
 
 
 [10]
 McCarthy asserts that claims for protection of "famous" marks should be brought under Section 43(a). See 4 McCarthy on Trademarks and Unfair Competition § 29:4 ("Lanham Act § 43(a) gives a foreign national without a federal registration of its mark standing to sue in a federal court, invoke the well-known marks doctrine of the Paris Convention Article 6bis, and prevail if its mark is so well-known in the U.S. that confusion is likely."). To the extent that a foreign entity attempts to utilize the famous marks doctrine as basis for its right to a U.S. trademark and seeks to prevent another entity from using the mark in the United States, the claim should be brought under Section 43(a). Under Section 43(a), both foreign and domestic entities can seek relief for infringement of unregistered marks.
 
 
 [11]
 Article 23 of the IAC, which appears under Chapter V of the IAC entitled "Repression of False Indications of Geographical Origin or Sources," provides: "Every indication of geographical origin or source which does not actually correspond to the place in which the article, product or merchandise was fabricated, manufactured, produced or harvested, shall be considered fraudulent and illegal, and therefore prohibited." IAC, Article 23, 46 Stat. at 2934
 
 
 [12]
 Article 20 of the IAC provides that "[e]very act or deed contrary to commercial good faith or to the normal and honorable development of industrial or business activities shall be considered as unfair competition and, therefore, unjust and prohibited." IAC, Art. 20, 46 Stat. at 2930-32. Article 21 provides:
 The following are declared to be acts of unfair competition and unless otherwise effectively dealt with under the domestic laws of the Contracting States shall be repressed under the provisions of this Convention: (a) Acts calculated directly or indirectly to represent that the goods or business of a manufacturer, industrialist, merchant or agriculturist are the goods or business of another manufacturer, industrialist, merchant or agriculturist of any of the other Contracting States, whether such representation be made by the appropriation or simulation of trade marks, symbols, distinctive names, the imitation of labels, wrappers, containers, commercial names, or other means of identification;
 (b) The use of false descriptions of goods, by words, symbols or other means tending to deceive the public in the country where the acts occur, with respect to the nature, quality, or utility of the goods;
 (c) The use of false indications of geographical origin or source of goods, by words, symbols, or other means which tend in that respect to deceive the public in the country in which these acts occur;
 (d) To sell, or offer for sale to the public an article, product or merchandise of such form or appearance that even though it does not bear directly or indirectly an indication of origin or source, gives or produces, either by pictures, ornaments, or language employed in the text, the impression of being a product, article or commodity originating, manufactured or produced in one of the other Contracting States;
 (e) Any other act or deed contrary to good faith in industrial, commercial or agricultural matters which, because of its nature or purpose, may be considered analogous or similar to those above mentioned.
 Id., Art. 21, 46 stat. at 2932-34.
 
 
 [13]
 Article 10bis provides:
 (1) The countries of the Union are bound to assure to nationals of such countries effective protection against unfair competition.
 (2) Any act of competition contrary to honest practices in industrial or commercial matters constitutes an act of unfair competition.
 (3) The following in particular shall be prohibited:
 
 
 [1]
 all acts of such a nature as to create confusion by any means whatever with the establishment, the goods, or the industrial or commercial activities, of a competitor;
 
 
 [2]
 false allegations in the course of trade of such a nature as to discredit the establishment, the goods, or the industrial or commercial activities, of a competitor;
 
 
 [3]
 indications or allegations the use of which in the course of trade is liable to mislead the public as to the nature, the manufacturing process, the characteristics, the suitability for their purpose, or the quantity, of the goods
 Paris Convention, Art. 10bis, 21 U.S.T. at 1648.
 
 
 [14]
 In any event, as noted above, any irreconcilable conflict between the Paris Convention and the Regulations would be resolved in favor of the Regulations
 
 
 [15]
 That statute provides:
 Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.
 N.Y. Gen. Bus. Law § 360-l (McKinney Supp.2004).